LUCY J., Appellant,

v.

STATE of Alaska, DEPARTMENT OF
HEALTH & SOCIAL SERVICES, OF-
FICE OF CHILDREN'S SERVICES,
Appellee.

No. S–13662.

Supreme Court of Alaska.

Dec. 17, 2010.

Christi A. Pavia, Pavia Law Office LLC, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.

Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Guardian ad Litem.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Lucy J. appeals the trial court's judgment terminating her parental rights to her chil-

dren Jack H. and Carmen H.[1] Lucy does not challenge the court's finding that Jack and Carmen were children in need of aid on the grounds of exposure to substance abuse, domestic violence, neglect, and Lucy's mental deficiency. But Lucy does challenge four of the trial court's other findings: that Lucy failed to remedy the conduct or conditions in the home that placed the children at substantial risk of harm; that OCS provided active efforts to keep the family together; that returning the children to Lucy's care is likely to result in serious emotional or physical damage to the children; and that termination of Lucy's parental rights is in the best interests of the children. Because abundant evidence supports the trial court's findings that Lucy failed to remedy her substance abuse and neglect of her children, we affirm those findings by the trial court. Our holdings that Lucy did not remedy her substance abuse and neglect make it unnecessary to decide whether Lucy remedied the problems associated with domestic violence and Lucy's mental deficiency. Because the trial court's legal conclusions were correct, and its other factual findings were not clearly erroneous, we affirm the rest of the judgment in its entirety.

## II. FACTS AND PROCEEDINGS

Lucy and Rick, the children's father, were in an on-again, off-again relationship from 2001–2005. Jack was born in September 2003 and Carmen in November 2005. Jack and Carmen were placed in foster care in July 2006, and have been in their current foster home since December 2006. These foster parents plan to adopt both children should Lucy's parental rights be terminated. Lucy is affiliated with the Tlingit and Haida Tribes of Alaska, and her children are Indian children within the meaning of the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1903(4).

### A. OCS Takes Emergency Custody Of Jack In October 2004.

Lucy first came into contact with the Office of Children's Services (OCS) in November 2003 when Rick called OCS to express

his concerns about the care of Jack. Rick alleged that Lucy had substance abuse and mental health problems, that she was leaving Jack with unsafe care providers, and that she was threatening to physically harm Jack if someone reported her to OCS. After investigating Rick's report, OCS found that Rick's concerns about Lucy threatening harm to Jack were unsubstantiated. OCS closed the case after providing Lucy with referrals to programs for parenting, mental health, and relationship support.

OCS became directly involved in Jack's life in October 2004, when social worker Caroline Bruschi was called by the police to come to Lucy's home. The police had been called to the home because of a reported sexual assault and found the home in disarray, with four intoxicated individuals present and one-year-old Jack in his crib in a very warm room with two bottles of sour milk. His diaper was full, and his shirt was soaked with urine. One of the individuals present in the home was a registered sex offender and had two children in OCS custody at the time. None of the adults present would tell Bruschi where Lucy was, so Bruschi took custody of Jack and left her card so Lucy could contact her.

Lucy did not contact Bruschi until three hours later. Bruschi met with Lucy and was concerned that Lucy did not seem to understand the importance of closely investigating potential caretakers for Jack.

OCS filed an Emergency Petition for Adjudication of Child in Need of Aid and For Temporary Custody shortly thereafter, on October 12, 2004. After a temporary custody hearing, Superior Court Judge Patricia A. Collins set a date in January 2005 for the adjudication trial and awarded Lucy temporary custody of Jack with supervision by OCS. Two days later Lucy left Jack with another caretaker whose children had been removed by OCS.

### B. OCS Provides Assistance To Lucy In Parenting Jack: October 2004— February 2005.

On October 15, 2004, OCS met with Lucy, representatives from the Temporary Assis-

---

**1.** We use pseudonyms throughout this opinion to protect the family's privacy.

tance for Native Families program, and representatives from the Central Council Tlingit and Haida Indian Tribes of Alaska ("Central Council") to discuss Lucy's case plan. The case plan recommended that Lucy undergo a substance abuse assessment at SouthEast Alaska Regional Health Consortium ("Health Consortium") and referred Lucy to a Central Council therapist named Amalia Monreal for assistance in developing healthy family and parenting choices. The guardian ad litem (GAL), Janine Reep, also added a provision to the case plan asking that OCS provide Lucy with assistance in scheduling appointments, obtaining new housing, and securing a bus pass.

Lucy submitted to a substance abuse assessment provided by Health Consortium counselor Albert Nells in mid-November. Lucy admitted that she had four minor consuming charges and a larceny charge on her record, that there was domestic violence in her relationship with Rick, that she had checked herself into the hospital when she was suffering from depression, that she was consuming ten beers per night and had engaged in binge drinking with binges lasting as long as two weeks, and that she had been dishonorably discharged from the National Guard. Nells issued his assessment report on December 8, 2004, diagnosing Lucy with alcohol dependence and recommending residential services in a therapeutic community, counseling for abuse issues, and additional evaluations for depression and traumatic brain injuries.

The OCS caseworker who took over Lucy's case, Stephanie Day, met with Lucy in late November 2004. At the time Lucy was using a number of services, including Temporary Assistance for Native Families, food stamps, parenting and anger management classes, and childcare assistance. Lucy communicated with Day frequently through at least 2005. Lucy also had a family caseworker from the Central Council, Larry Jackson, who was in regular communication with Day and Reep.

In January 2005 Lucy stipulated that Jack was a child in need of aid as a result of neglect under AS 47.10.011(9). The trial court then issued an Order for Adjudication and Disposition Based on Stipulation that adjudicated Jack as a child in need of aid and released him into Lucy's custody, subject to supervision by OCS.

Lucy completed inpatient treatment for substance abuse in Sitka during January and February 2005. Her aftercare recommendations included receiving intensive outpatient substance abuse and mental health treatment, following through with OCS and her parenting plan, finding a sponsor and attending Alcoholics Anonymous meetings, and following the care plan that she developed while in treatment.

Lucy also continued to have access to other services through OCS, including Catholic Community Services' Healthy Change Program, group and individual services with Monreal (the Central Council therapist), and a home-visiting pre-preschool program for Jack. Although the GAL recommended that Lucy receive assistance in obtaining housing, Lucy had secured housing where she wished to remain.

## C. Domestic Violence In Lucy's Relationships And Continued Services: Spring—Fall 2005

After Lucy returned to Juneau following her treatment in February 2005, Rick moved in with Lucy, and they were engaged to be married. Lucy became pregnant with the couple's second child, Carmen. Lucy and Rick began having problems in March 2005 and called Day twice in the middle of arguments for help. Day testified that "there was growing concern about domestic violence in the relationship," that Lucy expressed that she was "afraid that [Rick] may pound her face in," and that Lucy told Day that Rick was threatening to commit suicide. On March 31 Day drove Lucy to the AWARE shelter for domestic violence victims, and Day, Central Council, and AWARE assisted Lucy in obtaining an ex-parte domestic violence protective order against Rick in early April. Despite taking this action, Lucy declined to participate in the healthy relationships class offered by AWARE that Monreal and Day recommended for her.

Lucy participated in the Healthy Change program for a few months until it ended in

June 2005 because of a loss of funding. She also attended several AA meetings, but then stopped going even though Day encouraged her to join a group offered at a more convenient time. Lucy also had some involvement in a Parents Anonymous program but stopped attending because she believed the meetings were not helpful to her. Lucy had a hard time remembering her appointments with Monreal and lost touch with Nells.

Day referred Lucy to another Catholic Community Services program that focused on family preservation, but it was full, so Michael Dindinger, the family support specialist at Catholic Community Services, offered a less-intensive individual family support program to Lucy from August 2005 until November 2005. Dindinger interviewed both Lucy and Rick, who again had moved back in with Lucy for a brief period before returning to Skagway, and offered an initial assessment. After Rick left, Dindinger assisted Lucy in creating a family safety plan, which she later declined to sign, provided transportation to appointments for her, and helped her deal with public assistance. Dindinger discharged Lucy from the program after she completed it in November 2005 but continued to have interactions with her until February 2006 and occasionally talked to her and offered her transportation.

### D. Lucy Relapses During Pregnancy With Carmen: Fall 2005.

Meanwhile, in summer 2005, Day considered closing Lucy's case and releasing custody because she "seemed to be doing well," there were no new concerns, and "she had a lot of supportive services in place." Around this time Lucy, who was then six months pregnant, began expressing that she was under a lot of stress and needed a break from caring for Jack. In October 2005, a month before Carmen was born, Lucy disclosed to Day that she had been drinking one or two times a month beginning in June.

Day immediately tried to get Lucy into treatment at Rainforest Recovery Center, which offered to take her right away if Lucy could find a caretaker for Jack. Because Lucy did not want to put Jack in foster care, Lucy's brother came to care for Jack at Lucy's house, and Lucy entered treatment. Rainforest Recovery recommended that Lucy receive long-term inpatient treatment and was working to help Lucy get into the Fairbanks Native Association program. Although the Rainforest Recovery program was intended to last 21 days, Lucy stayed only three or four days. Even though Lucy checked out of their program, Rainforest Recovery submitted Lucy's paperwork to Fairbanks Native Association and found out that Lucy was eligible. Rainforest Recovery asked Lucy to come in and finalize the paperwork so that she could begin treatment in Fairbanks on November 11. Lucy did not show up to finish the paperwork, and she explained to Day that she "was not sure about going to treatment; that she felt treatment was stressful" and that the stress "would make her want to drink again."

### E. Lucy Gives Birth To Carmen And Moves To AWARE Shelter: Fall 2005—Spring 2006.

Lucy gave birth to her second child, a daughter named Carmen, on November 24, 2005 in Sitka. OCS received a report that Lucy told hospital staff that "she was looking forward to coming home, and she just wanted to smoke pot when she came home." OCS investigated and requested a drug test, which came back positive for marijuana use (THC).

On December 23, 2005, Day went to Lucy's residence for a home visit to see Lucy, Jack, and Carmen. Day noticed that Jack "was not very communicative" and did not respond to her attempts to play with him. Day was concerned by her observation and the fact that Lucy drank during her pregnancy with Carmen, so she made a referral for both children to an infant learning program. A week later, Lucy reported to Day that she was concerned that Jack may have been sexually abused by a babysitter who had been on probation for rape when he cared for Jack. Lucy told Day that Jack had been fussy and upset after the man had babysat him and that Jack was touching his genitals and had diaper rash the next morning.

After discussing the matter with Reep and Jackson, Day asked Lucy to go to the AWARE shelter on December 31, 2005.

Lucy eventually agreed, so Day provided Lucy with a $100 food voucher, helped her shop for groceries, and transported Lucy and the children to AWARE.

On January 4, 2006, OCS filed a Petition for Adjudication of Child in Need of Aid and for Temporary Custody, requesting OCS supervision of Carmen for a period not to exceed two years, and a Petition for Extension of Supervision Not To Exceed One Year, requesting that supervision of Jack continue for an additional year. Following a hearing on January 9, 2005, the trial court issued a temporary custody order stating that there was probable cause to believe that Carmen was a child in need of aid; granting temporary physical custody to Lucy, subject to OCS supervision; and setting the date for the adjudication trial. The parties (including the Central Council, whose motion to intervene was granted with regard to both children) stipulated that Carmen was a child in need of aid based on neglect under AS 47.10.011(9) on April 19, 2006. The trial court ordered Carmen adjudicated a child in need of aid and released her into the custody of Lucy, subject to supervision by OCS.

Day testified that she was willing to allow the children to stay with Lucy because they were staying at the AWARE shelter with safe people around them until Lucy could begin long-term treatment. Lucy left the AWARE shelter several times, however, and only returned after Day explained that she could either remain at AWARE or the children could go into state foster care. The staff at AWARE was concerned with Lucy's ability to respond appropriately to Jack's behavior and provided her with some basic techniques to help, such as cuddling, looking into his eyes, providing brain stimulation for him, and learning to read Jack's cues. There were also concerns that Lucy was inattentive with Jack and that she was leaving him unattended, requiring staff or other residents to watch him. These concerns were reported to David Plotnik, the OCS social worker who took over Lucy's case in March 2006.

### F. Staff At Residential Care Center And AWARE Shelter Report Neglect: May 2006—July 2006.

In May 2006 Lucy began treatment at Stepping Stones, a residential care center for women and their dependent children in Anchorage, where patients typically spend a year. Lucy testified that Plotnik only gave her three days to pack and that she had to give up her apartment in Juneau. She also had financial problems because, while Medicaid paid for her to be enrolled in Stepping Stones, she had to pay for other expenses such as child care. Because Lucy left Juneau, her Temporary Assistance for Native Families case was closed there and was not yet reopened in Anchorage, so she could not immediately receive assistance.

When Lucy arrived at the Stepping Stones shelter she tested positive for marijuana, although she indicated that she had not smoked for a month or two. Lucy immediately began to have problems in the program. She was late getting started because Jack and Carmen had not had the required tuberculosis tests; she dropped off Jack at daycare inappropriately dressed and with a full diaper; she sent Jack to daycare without proper food that a child of his age could eat or without any food at all; she did not properly bathe Jack, but instead only got his head wet to make it appear that she had bathed him; and she did not attend process groups and healing circles and would often drop Jack off at daycare and go back to sleep. Lucy was discharged from Stepping Stones in mid-July for causing a security breach by providing the security code for the whole facility to a homeless man. As a result of the breach, all of the combination locks of the facility had to be "re-keyed." The discharge letter to OCS stated that Lucy "is a danger to others and has not maintained the health of her child" and that the staff of Stepping Stones was "concerned about his health under [Lucy's] care."

When Lucy and the children returned to Juneau, Plotnik brought them back to the AWARE shelter, after reminding Lucy of the rules. AWARE staff reported that Lucy would leave the children unattended and would ask other residents to "provide for [Carmen's] basic care." Lucy failed to respond when Jack cried or when he attempted to exit the AWARE facility.

### G. Jack And Carmen Are Placed In Foster Care: July 2006.

A week after her discharge from Stepping Stones and after the negative reports from AWARE staff, OCS moved the trial court for modification of the court's January disposition orders, seeking to place the children in the custody of OCS.[2] After a hearing in mid-July 2006, the trial court found that OCS had made "active and reasonable efforts" to prevent removal of the children "but that continued placement in the home would be contrary to the children's welfare," that "there is clear and convincing evidence, including expert testimony, that the child[ren] are likely to suffer serious physical or emotional damage if left in the custody of the parents," and that modification of the disposition to place the children in the physical custody of OCS would serve the children's best interests. Jack and Carmen were then placed in foster care.

After Jack was taken into the state's custody, it was discovered that he needed extensive dental work. He had four baby teeth removed and 11 filled—some of the teeth were decayed down to the nerve. Although Lucy claimed it was because the foster parents were feeding Jack too much sugar, the dentist told OCS that such extensive decay must have started at birth. The preschool Jack attended reported that after being taken into custody and having his teeth fixed, Jack was doing much better.

### H. Lucy Is Diagnosed With Static Encephalopathy: July 2006.

After a Stepping Stones staff member expressed concern that Lucy might have fetal alcohol syndrome, Lucy's team, including Lucy, Reep, Plotnik, and Jackson consulted Ric Iannolino, a Central Council staffer who coordinates the Juneau fetal alcohol spectrum disorder (FASD) clinic. Iannolino recommended that Lucy be diagnosed. Iannolino had already had contact with Lucy, as she had self-referred to the FASD clinic in 2005, but she did not tell him at that time that OCS was involved with Jack. Lucy was evaluated at the FASD clinic by Dr. Mark Stauffer, a psychiatrist, and an FASD diagnosis team on July 21, 2006. Lucy was diagnosed with static encephalopathy, a non-progressive brain dysfunction which is essentially "brain damage that is a major component of [the diagnosed person's] cognitive and behavioral problems" that may or may not have been caused by alcohol. The diagnosis recommended a consistent routine and structure, reinforced through a schedule, calendar, or white board, that would function as an "external brain." Around this same time, Lucy met and began dating Andrew and left the AWARE shelter.

OCS did not immediately receive a copy of Lucy's diagnosis because Iannolino had to wait for Lucy to sign a release before he could disclose the information. Once OCS received the diagnosis, it rewrote Lucy's case plan into a one-page document that would be easier for her to understand. OCS also held regular meetings with Lucy, the Central Council, the GAL, Lucy's attorney, and Lucy's family to provide ongoing support. OCS also provided some one-on-one mentoring and used a number of strategies, including phone calls, face-to-face contact, and written documents, to remind Lucy of appointments, visitation changes, or tasks she needed to complete. Because OCS does not offer specific services for people with disabilities, Karilee Pietz, an OCS supervisor, made both telephonic and written referrals to REACH, which assists people with disabilities. REACH made several attempts to set up an intake appointment with Lucy, but Lucy did not show up.

### I. Lucy Misses Appointments And Refuses Services, OCS Has Problems With Andrew, And Jack Begins Therapy: Fall 2006—Fall 2007.

In October 2006 Pietz sent letters to Alaska Housing and Tlingit & Haida Housing, seeking housing for Lucy. Lucy continued to miss appointments, even though OCS provid-

---

**2.** OCS's motion only requested modification of the trial court's January 9, 2006 disposition order. This order only pertained to Jack. OCS's motion made it clear that it was seeking to modi-fy both children's disposition orders, as it listed both children in the motion's heading. The trial court read it as modifying the disposition orders of both children.

ed her with a bus pass. She was also arrested for shoplifting on October 6. Pietz also sent letters to the SouthEast Alaska Regional Health Consortium requesting a substance abuse assessment and an MRI for Lucy, who was suffering from frequent headaches. The Health Consortium responded that they could not do the substance abuse assessment and that they could not do the MRI because Lucy was pregnant.[3] Because Lucy did not return Rainforest Recovery's phone calls following OCS's referral for a substance abuse assessment, Pietz scheduled one for her on November 20, 2006; Lucy did not show up for the assessment.

In December 2006, after Catherine Edwards took over Lucy's case, Lucy's relationship with Andrew began to cause problems in her cooperation with OCS. Andrew began accompanying Lucy to meetings with OCS, but was hostile, disruptive, and discouraged her from participating in services. Several OCS staff asked that they not be assigned to visitation with Lucy because they felt intimidated by Andrew. Further, Jack and Carmen were moved to a second foster home after the first foster home reported that Lucy and Andrew harassed them so much by calling, stopping by the house, and trying to visit with the children outside of the home that they could no longer serve as foster parents for the children. In July 2007 Pietz (as the supervisor at OCS) wrote Andrew a letter telling him that he was no longer allowed at visitations or meetings in the OCS building because of "repeated incidents" that involved Andrew being "threatening and intimidating to the staff on many occasions."

In February 2007 Lucy went to Rainforest Recovery Center for a chemical dependency analysis and urinalysis tests. She was diagnosed as having alcohol dependence in remission. The outpatient substance abuse counselor who worked with Lucy noted that Lucy significantly minimized her chemical use in the 2007 assessment compared to the information she provided in her 2005 assessment. The counselor testified that "it's pretty difficult for someone who doesn't believe that they have a problem with substances to enter inpatient treatment," so the counselor recommended outpatient treatment to start. Lucy was placed in outpatient services, but only attended three scheduled groups. She was described as "marginally engaged and focused primarily on hostility towards OCS for being 'forced to attend.'" Lucy also refused to meet for individual counseling without Andrew present, and according to the counselor Andrew was "really hostile" and "seemed to be supporting [Lucy's] efforts to discontinue treatment." After Lucy discontinued outpatient treatment, Rainforest Recovery noted that it would refer her to intensive, residential, dual-diagnosis (meaning a program that could deal with both her static encephalopathy as well as her chemical dependency) inpatient treatment.

Also during February 2007 Edwards referred Jack to a mental health clinician, Sylvia Kidd. Jack was aggressive toward his foster siblings, intentionally rough with animals, and defiant with adults. He had problems at school, he had trouble sleeping and whimpered at night, he had a very high pain tolerance, he was often unresponsive and had a blank stare, he struggled with self regulation, and he apologized excessively. Kidd diagnosed Jack with post-traumatic stress disorder. She noted that his dissociative state, the "blank stare," was a typical coping response for young children who need to escape their present reality and that Jack had low communication skills with delayed articulation and expression. Kidd worked with Jack's second set of foster parents on strategies to assist Jack with these behaviors.

At the end of February Lucy made contact with Kate Wolfe, the family resources director at REACH. Lucy and Andrew met with Wolfe in March 2007. Lucy explained that she "had to [go to REACH] and show that she had been there, and that she was trying to get her children back." Wolfe explained that Lucy needed to have documentation to substantiate a disability, which Lucy did not bring to the meeting. Wolfe explained what services she could offer, and Lucy indicated that she did not wish to receive them.

---

**3.** Lucy's pregnancy later ended in a miscarriage.

At some point after quitting the outpatient treatment at Rainforest Recovery, Lucy told Edwards that she wished to return and get back into the groups there. Edwards contacted Rainforest Recovery, and they said that Lucy was disruptive and could only return if OCS would pay the $50 assessment fee and Lucy would commit to showing up. Instead of returning to Rainforest Recovery, Lucy entered the Central Council Wellbriety program in March 2007. Lucy did this on her own, and OCS social worker Edwards did not find out about it until just before a custody extension hearing in May 2007. After learning of Lucy's participation in Wellbriety, Edwards agreed that it could fulfill Lucy's alcohol treatment requirement, depending on what a current assessment would say, but noted that a current assessment was the appropriate first step.

Lucy also met with Ric Iannolino on March 22, 2007 and signed a release form allowing her FASD diagnosis information to be shared with OCS. The next day, Iannolino sent Edwards a fax offering to share resources concerning parenting with FASD and then followed up with a second fax almost a month later. Iannolino testified that OCS did not contact him specifically about Lucy's FASD diagnosis.

In May 2007 Edwards updated Lucy's case plan and developed a case plan for Andrew. The case plan required Lucy to remain sober and participate in a substance abuse program that would address her disability, to use AWARE's services to address her emotional health in relationships, to participate in AA, to learn and implement effective parenting techniques with assistance from Dindinger, and to secure stable housing and a job to provide a basic income. Andrew's case plan required him to seek a mental health assessment and a batterer's assessment and follow all recommendations from both assessments.

At the end of August 2007, OCS set up a family group decision-making meeting that included the Central Council, Reep, the foster parents, and some of Lucy's family members. Iannolino was invited to the meeting, but did not attend. The participants considered Lucy and Andrew's housing, Lucy's FASD, the children's special needs, increased visitation, improved communication between the stakeholders, and improved cultural connections.

Lucy and Andrew were not in stable housing for most of 2007, despite OCS sending letters on their behalf. Edwards testified that part of the reason Lucy and Andrew had problems getting into housing was that "they set up an adversarial situation with the people right away and ... become very hard for people to deal with...." Edwards offered to help them, but they consistently refused her assistance. In October 2007 Lucy finally secured stable housing on Douglas Island.

In fall 2007 social worker Leah Ogoy became Lucy's caseworker. Ogoy scheduled a meeting with Lucy and Andrew to update the case plan in late October, but Lucy and Andrew cut short the meeting and refused to discuss the case plan. Lucy did not return any of Ogoy's calls to reschedule the meeting.

### J. Emma Is Born And Lucy Has Encounters With Law Enforcement: November 2007—April 2008.

Shortly thereafter, in early November 2007, Lucy gave birth to Andrew's daughter Emma, her third child. Because Lucy had a newborn, OCS approved Lucy's request to have her visits with Jack and Carmen take place at her home. When Emma was about six weeks old, OCS received a protective services report that Lucy and Andrew had been fighting and that Lucy left Andrew with the baby but without formula or diapers. The report, which came from someone in the community, said that Andrew was feeding the baby Gatorade and that the baby looked malnourished. When police conducted a welfare check, they reported that the baby looked fine and had both diapers and formula. Six days later, a police officer found Lucy intoxicated outside of a bar in Juneau in the cold. A drunk man was holding Emma, and the officer observed Lucy leading the man with the baby back into the bar. Emma appeared to have a full diaper, and her clothing and blanket were wet. The police called OCS and Andrew, and Andrew took over care of Emma. Lucy took a portable breath test and registered .233% breath

alcohol, suggesting a high degree of intoxication.

In early 2008 Andrew called Ogoy and expressed his concerns about Lucy's drinking. Lucy began staying with her mother, instead of with Andrew. Lucy began to miss a number of scheduled visits with her children, even though they took place at her own house with transportation for the children provided by OCS or the Central Council. Ogoy updated Lucy's case plan and went over each item with her. Ogoy testified that she believed that the most important part of Lucy's case plan was for Lucy to obtain substance abuse treatment, but that Lucy was not willing to recognize that she needed help and was not willing to obtain the recommended services. Ogoy also testified that she attempted to contact Iannolino to discuss Lucy's FASD diagnosis, but Iannolino told her that the release that Lucy signed had expired in March 2008. Lucy refused to sign a new release of information regarding her FASD assessments or contact with Iannolino.

Lucy's pattern of erratic behavior continued when she was found drunk during an April 2008 assault investigation involving her brother. A week later Lucy was scheduled to meet with her children but failed to show up. Andrew said that Lucy was not there because she had been kicked out of her aunt's apartment for stealing beer and that Lucy had shown him bruises all over her arms and legs "from getting beaten up." Later that same day, Lucy was found intoxicated in a stranger's yard, resisted attempts by the police to put her in protective custody, and even attempted to unclasp the holster for the officer's pepper spray. The officer was forced to call for backup and Lucy was charged with disorderly conduct, but the charges were later dropped.

### K. Unsupervised Visits Lead To Confusion And Stress For The Children: May 2008—August 2008.

Following these events, Ogoy was unable to reach Lucy until Ogoy went to Lucy's home on May 27. Ogoy told Lucy that because OCS was no longer seeking reunification with Rick, the case plan was being formally changed to adoption. At the case review the next day, the foster mother described that Jack was masturbating until his penis bled. The team also decided to continue allowing Lucy to have unsupervised visits with the children in her home.

Despite being apprised of the situation with Jack and the fact that his counselor was working with him on it, Lucy and Andrew called the police to their residence during a later visit to report Jack's behavior. Jack's later counseling sessions revealed that the police arriving to talk about his masturbation caused him a great deal of stress. During another visit in June, Lucy and Andrew took a jean jacket that Jack was wearing, cut off the sleeves, and drew a picture of a shark on the back with Lucy, Andrew, Jack, and Carmen's first names with Andrew's surname on it. After the jacket was finished, it was given to Carmen. In his counseling sessions with Kidd, Jack exhibited signs of confusion and stress both because of the use of Andrew's surname and because his jacket was taken and given to Carmen. He was also confused about where his home was and where he belonged. Lucy and Andrew also gave Jack a very short haircut that was uneven and choppy, which also caused him distress. Jack's foster parents reported that Jack was waking in the night screaming and crying and that his bladder and bowel control had regressed such that he was urinating and defecating in his pants.

In June 2008 Carmen was given an FASD evaluation because Lucy admitted to drinking while she was pregnant with Carmen. Andrew, Lucy, Jack, and Emma attended the assessment along with Carmen, and Andrew eventually tried to stop it by being "very loud and aggressive" and claiming that OCS did not have custody of the children. Iannolino asked Andrew to leave, but eventually had to call the police and have Andrew removed.

Also in June, Lucy enrolled in two classes through the Central Council, Positive Indian Parenting and Financial Literacy. She completed both of these programs in August. Ogoy tried several times to meet with Lucy and Andrew during August 2008, but they were not able to meet. When her attempts to meet with them did not work, Ogoy wrote them a letter, which she hand delivered, and

included an updated case plan and a list of service providers. The case plan required that Lucy get current substance abuse and mental health assessments.

### L. Lucy And Andrew Miss Visits And Foster Parents Wish To Adopt: Fall 2008.

Lucy and Andrew were married in September 2008. Shortly thereafter, Andrew's mother died, so Lucy and Andrew could not visit with the children for a week. More cancellations followed, for a total of five missed visits in September and two missed visits in early October. Because of the sporadic visits in September and October, the children's disappointment when visits were canceled, and concerns expressed by Jack's counselor, visitation was reduced to one time per week supervised by OCS. Because of the number of times that Lucy and Andrew were unavailable on the day of a visit, OCS worked out an arrangement where the children would not be picked up until Lucy and Andrew had arrived at OCS.

Jack and Carmen have been in their current foster home since December 2006. The foster mother has worked as a therapist and has extra skills and training to assist with Jack's learning disabilities. At the time of trial, both children were receiving services for their special learning and developmental needs. The foster parents wish to adopt both children, and the children seem bonded to the entire foster family. The foster parents have also expressed willingness to allow the children to continue relationships with their biological parents and their half-sister, Emma, as well as be involved in tribal cultural activities.

### M. Lucy's Parental Rights Are Terminated By The Trial Court: August 2009.

OCS filed a Petition for Termination of Parental Rights on July 11, 2008. The trial on the termination petition was held in December 2008 and January 2009. The trial court ruled that "the state has met its heavy burden of proof with respect to justification for termination of the mother's parental rights." The court found that there was clear and convincing evidence that Jack and Carmen were and continue to be children in need of aid under: AS 47.10.011(8), because "conduct by the parents [has] resulted in mental injury to the children and at least one of the parents have engaged in a pattern of behavior, including exposure to significant domestic violence, that has caused serious mental injury to the children and continued exposure would expose the children to substantial risk of serious mental injury"; AS 47.10.011(9), because "conduct by the parents subjected the children to neglect"; AS 47.10.011(10), because "the parent's ability to parent has been substantially impaired by the habitual use of intoxicants and the children were and are at substantial risk of harm should such behavior continue"; and AS 47.10.011(11), because "mother has a mental disorder, static encephalopathy, which is of a nature and duration that places her children at substantial risk of serious physical harm or mental injury." The court also found that "[i]ncredible and active efforts were made by both the state and the tribe over the four years OCS had custody of these children to reunify the children with their mother." Because the court found that the state had not presented sufficient evidence that ICWA standards had been met with respect to Rick, the court did not rule that the termination of parental rights was in the children's best interests and denied the petition without prejudice. At the end of July 2009, after five months of working on a reunification plan, Rick consented to the adoption of Jack and Carmen by their foster family. The trial court explained in its August 2009 termination order "[b]ecause there is no longer any impediment to a best interests finding" and because the children were thriving in their foster home, "it is in the children's best interests that [Lucy's] parental rights be terminated."

Lucy does not challenge the finding that the children have been subjected to conduct in the past that led to their designation as children in need of aid. She instead appeals the trial court's findings that she has not remedied the conduct that placed the children at substantial risk of harm under AS 47.10.011, that there was clear and convinc-

ing evidence that OCS had provided active efforts toward reunification under ICWA,[4] that there was evidence showing beyond a reasonable doubt that returning the children to Lucy would cause them serious emotional or physical harm, and that it was in the best interests of the children for Lucy's parental rights to be terminated.

## III. STANDARD OF REVIEW

Before terminating parental rights under ICWA and the Child in Need of Aid (CINA) statutes and rules, a trial court must find by clear and convincing evidence that "the child has been subjected to conduct or conditions described in AS 47.10.011";[5] that the parent "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm" or that the parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child at substantial risk of physical or mental injury";[6] and in the case of an Indian child, that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[7] ICWA also requires that the court find "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child."[8] Finally, it must be determined by a preponderance of the evidence that "termination of parental rights is in the best interests of the child."[9]

In a CINA case, we review a superior court's findings of fact for clear error.[10] The trial court's finding that a parent has failed to remedy the conduct that placed the child at substantial risk is generally a finding of fact that is reviewed only for clear error.[11] Findings of fact are clearly erroneous if we are left "with a definite and firm conviction that a mistake has been made" after a review of the entire record in the light most favorable to the party prevailing below.[12] We review whether a trial court's findings satisfy the statutory requirements of the CINA and ICWA statutes de novo.[13]

Whether OCS made active efforts as required by ICWA is a mixed question of law and fact.[14] We review de novo whether the trial court's finding that active efforts were made failed to comport with ICWA requirements.[15] Similarly, "[w]hether substantial evidence supports the trial court's conclusion that a child is likely to be seriously harmed if returned to her parent is a mixed question of fact and law, while whether the expert testimony requirement of [ICWA] is satisfied is a pure question of law" that we review de novo.[16] We review issues that were not raised at trial only for plain error on appeal.[17]

4. 25 U.S.C. § 1912(d) (2006).

5. AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A). Lucy does not appeal this finding.

6. AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(i).

7. 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

8. 25 U.S.C. § 1912(f) (2006); CINA Rule 18(c)(4).

9. CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

10. *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 502 (Alaska 2009) (citing *Brynna B. v. State, Dep't of Health & Soc. Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

11. *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010).

12. *Brynna B.*, 88 P.3d at 529 (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000)).

13. *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004).

14. *Sandy B. v. State, Dep't of Health & Soc. Servs.*, 216 P.3d 1180, 1186 (Alaska 2009).

15. *Id.*

16. *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009).

17. *In re Adoption of L.E.K.M.*, 70 P.3d 1097, 1100 (Alaska 2003).

## IV. DISCUSSION

### A. The Trial Court Did Not Err In Finding That Lucy Did Not Remedy The Drug And Alcohol Abuse And Neglect That Placed The Children At Substantial Risk Of Harm.

 The trial court found that "there is clear and convincing evidence that [Lucy] has not remedied the conduct that placed the children at substantial risk of harm." Alaska Statute 47.10.088(a) provides that in order to terminate parental rights, a court must find that the parent has "not remedied the conduct or conditions in the home that place the child at substantial risk of harm." Alaska Statute 47.10.088(b) directs courts to consider any fact relating to the best interests of the child in making this determination, including:

(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;

(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;

(3) the harm caused to the child;

(4) the likelihood that the harmful conduct will continue; and

(5) the history of conduct by or conditions created by the parent.

The trial court discussed each of the factors that led it to determine that Jack and Carmen were children in need of aid: Lucy's drug and alcohol abuse, her static encephalopathy, her neglect of the children, and her history of involvement with domestic violence. Because we affirm the trial court's findings with respect to Lucy's drug and alcohol abuse and neglect of the children, we do not reach whether Lucy failed to remedy the other two grounds for finding that Jack and Carmen were in need of aid.

The trial court ruled in relevant part that Jack and Carmen were children in need of aid because Lucy's "addiction to alcohol and marijuana has resulted in a substantial risk of serious mental and physical harm to her children." The court pointed to several specific events, including Lucy's drinking while pregnant with Carmen and taking Emma to a bar while intoxicated, to demonstrate the type of harm that could result from Lucy's substance abuse problem. The court explained its conclusion that Lucy had failed to remedy this issue:

> Despite multiple treatment programs, [Lucy] has not maintained long-term sobriety and has hidden her continued drinking. While it appears that she has maintained sobriety for at least the last few months, she appears to lack the capacity for long-lasting change. While [Andrew], to his credit, appears to have been instrumental in maintaining and encouraging [Lucy's] sobriety, [Lucy's] inability or unwillingness to take any responsibility for the harm caused to her children by her history of alcohol and drug use indicates an inability/unwillingness to embrace long-term change. [Lucy's] refusal to enter appropriate long-term treatment similarly reflects a lack of commitment to change.

Lucy argues that the trial court erred in finding a failure to remedy the conduct that led to Jack and Carmen being found children in need of aid under AS 47.10.011(10).[18] Lucy seems to admit to alcohol use in April 2008, during the incident when she was found drunk during an assault investigation of her brother and when she was arrested for disorderly conduct after being intoxicated in a stranger's yard on April 21. She argues, however, that there were no children around during these binges and that her alcohol use occurred outside of the home. Lucy argues that she had demonstrated nine months of sobriety at the time of trial and that there

---

18. AS 47.10.011(10) states that a court may find a child to be in need of aid if:

the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child; if a court has previously found that a child is a child in need of aid under this paragraph, the resumption of use of an intoxicant by a parent, guardian, or custodian within one year after rehabilitation is prima facie evidence that the ability to parent is substantially impaired and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child as described in this paragraph.

was no evidence to support a finding that her use of alcohol had impaired her parenting.

A review of the record shows that Lucy has struggled for years with alcohol abuse and dependency and has failed to undergo recommended assessments and fully engage in treatment programs provided to her. Lucy admitted to drinking while she was pregnant with Carmen and tested positive for marijuana use following Carmen's birth, after leaving her treatment program at Rainforest Recovery early. She also tested positive for marijuana use in May 2006 at the Stepping Stones residential care facility—another program she did not complete. Her February 2007 assessment indicated that Lucy was significantly understating her chemical usage, rather than admitting that she had a problem. Lucy only attended three sessions recommended as part of her outpatient services, and she was described as being "marginally engaged" and refused to meet for individual sessions without Andrew's presence. Only six weeks after Emma was born, Lucy was found intoxicated with the baby outside of a bar in the cold. A few months later, Lucy had the two alcohol-related encounters with law enforcement. Although her children were not present at these incidents, one of them occurred on the same day that she missed a scheduled visitation with Jack and Carmen. Despite the requirements of her case plan, Lucy never underwent another substance abuse assessment following the April 2008 incidents and did not complete the treatment programs recommended by her earlier assessment.

Lucy testified at trial in January 2009 that she was no longer using alcohol and that just a few days earlier, she had enrolled in a Wellbriety class similar to the one she had completed in September 2007 before her relapse. Lucy repeatedly denied that she had an alcohol problem and denied that she ever smoked marijuana. She also testified at trial that she "had taken AA meetings" recently, but provided no further information about her participation. Lucy did not prove her sobriety prior to trial by submitting to random urinalysis testing.

Lucy's argument that the children were not present during her alcohol use has limited relevance. We have clearly stated that the CINA "statute does not require that a child be present" when the substance use occurred.[19] Lucy's behavior clearly had a negative impact on the children—she missed a visit with Jack and Carmen on the same day that she was arrested for being intoxicated.

Because the trial court is instructed by AS 47.10.088(b)(5) to consider the history of the parent's conduct and by AS 47.10.088(b)(4) to consider the likelihood the conduct will continue, the trial court's view that Lucy's history of treatment (and her lack of commitment to it) indicates that she has not embraced long-term change is not clearly erroneous. Lucy does not dispute that her past substance use has placed her children at substantial risk of harm, and it is therefore likely that continued substance use would continue to place the children at risk. We conclude that the trial court's finding that Lucy failed to remedy her substance abuse is amply supported by the record and did not amount to clear error.

There is also ample evidence to support the trial court's finding that Lucy failed to remedy her neglect of the children. Lucy's history of neglecting Jack and Carmen is well-documented by the record. As the trial court found, Lucy "has been repeatedly reported for failing to properly feed, dress, clean, and supervise the children," and has repeatedly left the children with inappropriate caregivers. These incidents include leaving Jack in the care of intoxicated individuals whose own children were in OCS custody, drinking alcohol while pregnant with Carmen, leaving Jack with a caretaker who was on probation for rape, and failing to properly supervise and care for both children while living at the AWARE shelter and the Stepping Stones treatment center. The trial court correctly considered this history of Lucy's conduct under AS 47.10.088(b)(5).

19. *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1259 (Alaska 2010).

Lucy argues that there have been no allegations of neglect since she left the AWARE shelter in summer 2006, that she and Andrew are parenting Emma successfully, and that she has completed a parenting class through the Central Council. Lucy did complete a Positive Indian Parenting class in August 2008. But Jack and Carmen were placed in foster care in the summer of 2006, so the absence of neglect allegations after summer 2006 has little relevance. Furthermore, the incident where Lucy was found intoxicated with Emma outside a bar in the cold occurred in December 2007, well after the complaints from the AWARE shelter. OCS allowed Emma to remain in Lucy and Andrew's custody after that incident only after it created a safety plan requiring Andrew (as opposed to Lucy) to maintain constant supervision of Emma and to be Emma's primary caregiver. Although there is some evidence that Lucy's parenting skills have improved since Emma's birth, Lucy's extensive history of neglecting Jack and Carmen and recent conduct with Emma demonstrates that she has not remedied the neglect that placed Jack and Carmen at substantial risk of harm. The trial court's finding was not clearly erroneous. Because a failure to remedy any of the conduct or conditions that led to a CINA finding is sufficient to support a termination order,[20] we do not need to decide whether Lucy failed to remedy the conduct giving rise to the other CINA findings.

**B. The Trial Court Did Not Err In Finding That Active Efforts Had Been Made To Prevent The Breakup Of The Family.**

 Before parental rights can be terminated, ICWA requires that a court find by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[21] Whether OCS made active efforts is determined on a case-by-case basis.[22] Generally, we will find that active efforts have been made where OCS "takes the client through the steps of the plan for reunification of the family"[23] but decline to find active efforts where "OCS develops [a] case plan, but the client must develop his or her own resources towards bringing it to fruition."[24] In evaluating whether OCS met its active efforts burden, a court may consider "a parent's demonstrated lack of willingness to participate in treatment"[25] and look "to the state's involvement in its entirety."[26]

The trial court held that "[i]ncredible and active efforts were made by both the state and the tribe" toward reunification over the four years that OCS had custody of Jack and Carmen. The court listed examples of some of these efforts: "multiple efforts to help [Lucy] secure safe housing, multiple referrals to alcohol treatment programs, bus passes for visitation, mentoring-style visitation facilitation, psychological examinations for [Lucy] and the children, Head Start, parenting education, tribal counseling in group and individual settings, and counseling for the children." The court strongly disagreed with any suggestion that OCS did not do enough to assist Lucy given her mental deficiency. The trial court explained that Lucy's testimony made it clear she understands the consequences of drinking while pregnant or caring for her children and she is capable of initiating programs and accessing services when she wants to.

**20.** *See Alyssa B. v. State, Div. of Family & Youth Servs.*, 165 P.3d 605, 618 (Alaska 2007) (holding that one CINA finding alone would support a termination order).

**21.** 25 U.S.C. § 1912(d) (2006); CINA Rule 18(c)(2)(B).

**22.** *Wilson W. v. State*, 185 P.3d 94, 101 (Alaska 2008).

**23.** *Id.* (quoting *C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214, 1219 (Alaska 2001)).

**24.** *Id.* (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)) (internal quotation marks omitted).

**25.** *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008) (quoting *N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001)).

**26.** *Maisy W.*, 175 P.3d at 1268.

Lucy argues that because multiple social workers were assigned to her case, active efforts broke down after March 2006. She describes OCS's efforts to provide her with inpatient substance abuse treatment at the Stepping Stones residential center as "a complete failure of active efforts" and claims that it was ill-planned and doomed her to failure. She also argues that OCS failed to incorporate her diagnosis of static encephalopathy into her case plan and provide her with the reasonable accommodations required under the Americans with Disabilities Act (ADA).[27]

We have already described many of the efforts made by OCS and the Central Council. From its first involvement in this case in 2004, OCS remained actively engaged in assisting Lucy. OCS developed several case plans; made referrals for services including substance abuse assessments, mental health services, parenting classes and support services, and substance abuse treatment; assisted Lucy in getting a bus pass and secure housing; helped Lucy get a protective order; and provided supervision for visits as well as transportation for the children for both supervised and unsupervised visits. OCS also offered services to Andrew, such as offering to pay for day care for Emma, referring him to Central Council programs for at-risk families, and including him in its case plans. Services were also offered to the children, including getting both Jack and Carmen involved with an infant learning program, providing Jack with extensive dental work, and giving Jack a referral to a mental health clinician (Kidd). OCS began providing services to Lucy in 2004 and continued through trial five years later with no significant breaks.

Lucy argues that her static encephalopathy diagnosis should have changed OCS's active efforts. She does not explain what OCS should have done differently, except that "OCS should have referred Lucy to

Hope Industries Inc. and to Dena A. Coy for inpatient treatment" and that "with proper supports, explanation, and lead time Lucy would have been better able to process the plan." But she admits that her diagnosis was incorporated into her October 2006 case plan after she signed the appropriate release so that OCS could receive the diagnosis. Further, Rainforest Recovery tried to refer Lucy to a dual-diagnosis inpatient program but noted that she was non-compliant with even her outpatient treatment.[28] OCS repeatedly referred her to various substance abuse treatment programs over a period of years. Any argument that OCS failed to refer Lucy to a particular plan or to offer her more explanation or lead time is simply not persuasive.

Lucy's second argument is that OCS failed to reasonably accommodate her disability (static encephalopathy) under the requirements of the Americans with Disabilities Act (ADA).[29] Lucy alleges two specific instances of OCS's failure in this regard: (1) the lack of reference to the static encephalopathy/FASD diagnosis in the May 2007 case plan and (2) the problems with communication between OCS and Iannolino at the FASD clinic. Lucy argues that, in order to fulfill the active efforts requirement, OCS needed to connect her with service providers who could have assisted with her diagnosis.

Our case law and the internal policies of OCS suggest that family reunification services should be provided in a manner that takes a parent's disability into account. Title II of the ADA provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[30] In *C.W. v. State, Department of Health & Social*

**27.** 42 U.S.C. §§ 12101–12213.

**28.** *See Maisy W.,* 175 P.3d at 1268 (holding that the court can consider a parent's lack of willingness to participate in treatment). Lucy indicated a willingness to participate only in AA meetings or a "Talking Circle" group, but refused to continue outpatient treatment that required UA tests and breathalyzers. The Rainforest Recovery sub-

stance abuse counselor also noted that Lucy was minimizing her substance use instead of admitting that she had a problem and seeking recovery.

**29.** 42 U.S.C. §§ 12101–12213.

**30.** 42 U.S.C. § 12132 (2006).

*Services* we noted that "[t]he Code of Federal Regulations and the federal case law uniformly suggest that the reunification services provided by [the state] are 'services' within the contemplation of Title II." [31] The OCS policy manual similarly states that "[n]o qualified individual with a disability shall be excluded, by reason of such disability, from participation in or be denied the benefits of the services, programs, or activities of [OCS]" [32] and that "[OCS] shall operate each of its services, programs, and activities so that a service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." [33]

In *J.H. v. State, Department of Health & Social Services*, however, we intimated that an independent analysis under the ADA may be unnecessary to review whether OCS's efforts properly considered a parent's disability. In that case we stated that, assuming for the sake of argument that the ADA applied to CINA proceedings, the "requirement that [OCS] make reasonable efforts to provide [a parent] with family support services appears to be essentially identical to the ADA's reasonable accommodation requirement." [34] Therefore the question whether reunification services reasonably accommodated a parent's disability is already included within the question whether active or reasonable[35] efforts were made to reunite the family. In other words, if OCS "fails to take into account the parents' limitations or disabilities and make

any reasonable accommodations, then it cannot be found that reasonable efforts were made to reunite the family." [36] In order to "take[ ] the client through the steps of the plan for reunification" [37] in a way that will satisfy the active efforts requirement, OCS must reasonably tailor those steps to the client's individual capabilities.

In this case, there is abundant evidence that OCS fulfilled whatever responsibility it may have had to accommodate Lucy's disability. Lucy was provided with extensive services over a lengthy period of time that took her disability into account. OCS rewrote Lucy's case plan after her diagnosis to present the information in a straightforward way that highlighted the most important elements, and assisted Lucy in meeting her basic needs such as stable housing. OCS also referred Lucy to REACH to get assistance with her disability, but Lucy failed to substantiate her disability when she finally visited REACH and then refused the services they offered. Finally, OCS provided Lucy with one-on-one mentoring, using phone calls, face-to-face contact, and written documents to remind Lucy of appointments, visitation changes, and tasks that she needed to complete—techniques recommended by her FASD diagnosis.

Although the record does demonstrate that there were some difficulties in communica-

---

31. 23 P.3d 52, 55 (Alaska 2001); *accord In re Adoption of Gregory*, 434 Mass. 117, 747 N.E.2d 120, 126 (2001) (concluding that the ADA, as well as state law, requires the state to accommodate a parent's disability in services provided prior to the termination of parental rights); *In re Terry*, 240 Mich.App. 14, 610 N.W.2d 563, 570 (2000) (holding that reunification services provided by the state must comply with the ADA).

32. Alaska Office of Children's Services, Child Protective Services Manual § 6.1.14(a) (2010), *available at* http://www.hss.state.ak.us/ocs/Publications/CPSManual/cps-manual.pdf.

33. *Id.* § 6.1.14(c).

34. 30 P.3d 79, 86 n. 11 (Alaska 2001); *accord In re Terry*, 610 N.W.2d at 570 (noting that the analysis of whether the state has made reasonable efforts is "consistent with the ADA's directive that disabilities be reasonably accommodated").

35. In cases involving a non-Indian child, the court must find that OCS made "reasonable" efforts to reunify the child with the parent. AS 47.10.088(a)(3); CINA Rule 18(c)(2)(A); *Tara U. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 239 P.3d 701, 704 (Alaska 2010).

36. *In re Terry*, 610 N.W.2d at 570; *see also In re Antony B.*, 54 Conn.App. 463, 735 A.2d 893, 899 n. 9 (1999) (noting that the requirement to make reasonable efforts at reunification "includes taking the parent's mental condition into consideration"); *In re Torrance P.*, 187 Wis.2d 10, 522 N.W.2d 243, 245 (Wis.App.1994) (holding that the requirement to make a diligent effort to provide services must be examined in light of a parent's cognitive limitations).

37. *Wilson W. v. State*, 185 P.3d 94, 101 (Alaska 2008) (quoting *C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214, 1219 (Alaska 2001)).

tion between Iannolino at the FASD clinic and OCS, the record is also clear that OCS included Iannolino in one of Lucy's team meetings and invited him to attend the family group decision-making meeting that took place in August 2007. On at least two of the occasions that OCS contacted Iannolino about Lucy, right after the diagnosis and again in December 2008, Lucy had not executed a current release of information that would allow Iannolino to discuss Lucy's diagnosis with OCS. After Lucy's diagnosis was made known to OCS, all of her case plans made recommendations related to her mental deficiency.[38] Further, as the trial court held, Lucy's "testimony at trial made clear that she is capable of and has initiated programs when she wants to." Lucy's repeated failures to complete the elements of her case plan, engage in meaningful substance abuse treatment, and show up for meetings that OCS had arranged for her provided the trial court with evidence that she was more hindered by her unwillingness to participate in the plan than she was by a lack of capacity to do so.

Whether the issue is framed as a reasonable accommodation or simply as active efforts tailored to the individual case, OCS made remarkable and exemplary efforts to prevent the breakup of Lucy's family. The trial court did not err in finding that OCS made the active efforts required by ICWA.

### C. The Trial Court Did Not Err In Finding That Returning The Children To Lucy Was Likely To Result In Serious Emotional Or Physical Harm.

■ The trial court held that "return of the children to [Lucy's] care poses virtual certain harm, both emotional and physical, to the children." The court pointed to Lucy's unresolved substance abuse, for which she had refused to enter long-term treatment, and her other conduct that could be dangerous to the children's physical and emotional health, including leaving the children with unsafe caregivers, missed visits, and actions such as the jacket and hair-cutting incident that confused and upset the children. The court concluded that there was a great risk of emotional harm for Jack and Carmen if they were returned to the home.

Lucy makes two arguments: first, that the expert testimony requirement of ICWA was not satisfied by the testimony presented during trial, and second, that the trial court's finding that there was evidence beyond a reasonable doubt that Jack and Carmen were likely to suffer serious harm if returned to Lucy's care was clearly erroneous.

■ ICWA requires that a court find "beyond a reasonable doubt, based on evidence that includes testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[39] This finding requires both proof that "the parent's conduct is likely to harm the child, and proof that it is unlikely the parent will change her conduct."[40] The trial court is able to aggregate testimony from expert witnesses, lay witnesses, and other evidence to meet this ICWA proof requirement.[41]

■ This strong standard of proof reflects Congress's intended goal of preventing the breakup of Native families "solely on the basis of testimony from social workers who lacked the familiarity with Native culture necessary to distinguish between the cultural and social standards prevailing in Indian

---

**38.** Lucy contends that the May 2007 case plan "completely ignored the FAS finding and disability altogether." This is false, as the May 2007 plan mentioned Lucy's "underlying mental health, cognitive, and emotional issues" and required her to "complete a drug and alcohol residential program that will address her disability needs." Such a dual-diagnosis program would have specifically provided assistance tailored to a person with her cognitive limitations. Lucy elected not to enter such a program or even continue outpatient substance abuse treatment,

despite Rainforest Recovery's offer of a referral in February 2007.

**39.** *Marcia V. v. State, Office of Children's Servs.,* 201 P.3d 496, 503 (Alaska 2009).

**40.** *Id.*

**41.** *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 204 P.3d 1013, 1020 (Alaska 2009).

communities and families and actual abuse or neglect."[42] A witness can be qualified as an expert under ICWA because of her personal contact with Native cultures or experience working with such cultures.[43] We have held, however, that "[w]hen the basis for termination is unrelated to Native culture and society and when any lack of familiarity with cultural mores will not influence the termination decision or implicate cultural bias in the termination proceeding, the qualifications of an expert testifying under § 1912(f) need not include familiarity with Native culture."[44]

■■■ In this case, the trial court accepted the testimony of Sylvia Kidd, Sharon Fleming, Karilee Pietz, and Leah Ogoy as fulfilling the ICWA requirement. At trial, there was only an objection to Ogoy being qualified as an expert, and the court limited her qualification to being an expert on child development only. Because the qualifications of the experts other than Ogoy were not challenged at trial, we review such qualifications only for plain error.[45] We consider whether the qualification of Kidd, Fleming, and Pietz amounted to plain error, and whether their testimony was sufficient to support the trial court's finding. Such plain error exists in a CINA case where "an obvious mistake has been made which creates a high likelihood that injustice has resulted."[46]

■■■ Sylvia Kidd was qualified as an expert without objection from Lucy. Kidd was recognized as an expert in mental health, has a master's degree in community psychology, has significant work experience, is a licensed professional counselor, and has received other relevant training. It is noteworthy that Kidd also has experience working for the Tanana Chief's Conference Counseling Center in Fairbanks and has some experience working with Native populations. There was no objection to Kidd's expertise at trial and no indication that her testimony created the high likelihood of injustice required to reverse under the plain error standard. Kidd diagnosed Jack with post-traumatic stress disorder and explained a number of problems Jack had experienced. She also testified that incidents that happened in Lucy's home not long before trial, including the jacket and hair-cutting incidents, distressed and confused Jack. Finally, she testified that Jack's hyperactive stress response made him susceptible to emotional harm from problems in the home. This offers at least one concrete reason why it was possible for Emma to remain in the household, but why there was still serious risk involved in returning Jack and Carmen.[47] Kidd also praised the progress Jack was making in foster care. Kidd admitted that she had not met with Lucy, but expressed her concern about Lucy's recent behavior, including missed visits and her failure to undergo alcohol treatment.

■■■ Fleming holds a masters in social work, has worked at OCS for six years, has

**42.** *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 951 (Alaska 2000) (internal quotation marks omitted).

**43.** *Id.*

**44.** *Marcia V.*, 201 P.3d at 503.

**45.** *See id.* Because Ogoy was objected to at trial, we will consider whether the other expert testimony was sufficient to sustain the trial court's finding.

**46.** *Id.* at 502 (quoting *Miller v. Sears*, 636 P.2d 1183, 1189 (Alaska 1981)).

**47.** Lucy argues that because Emma remains in the household, there cannot be conduct or conditions which make it likely that Jack and Carmen will suffer serious physical or emotional harm. Because this case is not about Emma and the record does not offer a full picture of Emma's contact with OCS and her case, it is impossible to compare these situations. We need only ensure that the CINA and ICWA requirements are met for parental termination with regard to Jack and Carmen, rather than reviewing Emma's situation. Whether it is possible for Emma to remain in the household is legally and factually irrelevant. Despite Lucy's attempts to analogize this case to the situation in *C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214 (Alaska 2001), in that case there was not sufficient evidence or expert testimony to support a finding that placement with the parent was likely to result in serious physical or emotional damage to the children. The adequacy of the evidence is the salient question that we considered, not the fact that the parent in *C.J.* was successfully parenting another child.

served as a supervisor for four years, is licensed by the State of Alaska as a masters level social worker, and has had many trainings, including some that were ICWA specific. She came into contact with this case as Ogoy's supervisor in 2007 and most of her involvement was supervisory in nature, except to assist when Ogoy was out of the office, but she did have some direct contact with the case participants. Fleming also had reviewed the entire case file and heard almost all of the evidence presented at trial. While it is not clear that Fleming has "expertise beyond the normal social worker qualifications,"[48] Lucy abandoned this issue at trial by failing to object to Fleming's qualification as an ICWA expert. As we held in a similar situation in *Marcia V. v. State*, because it was possible to infer from Fleming's known qualifications that she possessed the qualifications necessary under ICWA, it was not plain error for the trial court to accept Lucy's acquiescence.[49]

Fleming offered clear testimony on the ultimate issue: "My opinion [is] that the children would be at significant risk of physical and emotional harm if returned to [Lucy's] care." Fleming listed her reasons why: Lucy's untreated substance abuse; her use of alcohol during the pregnancy with Carmen; her relapse in spring 2008; her impaired judgment and lack of intellectual capacity; her repeated decisions to leave her children with unsafe or unknown caregivers; her poor judgment with respect to her children; her unrealistic expectations of her children, which lead her to place them in unsafe situations; her prioritization of her own needs before her children's needs; and her inability to provide the kind of consistent home that her children with special needs require, given her mental deficiency.

■ Finally, Pietz was qualified as an expert in social work: She served as licensed social worker in Minnesota for eleven and a half years before beginning at OCS as a supervisor in 2006. She also had several years of experience working with children and adults with developmental disabilities. As with Fleming and Kidd, there is no indication that it was plain error to allow Pietz's qualification as an expert. Further, Pietz served mainly as a fact witness, although she did offer several opinions, including that Lucy had the ability to participate in services but was simply unwilling to engage in most of them. She also testified about her concern that Lucy struggled and was sometimes not able to meet her own basic needs, and that this would result in Lucy not being able to meet the basic needs of the children. Even if both Pietz and Ogoy were considered only fact witnesses, the expert testimony of Kidd and Fleming, given that their qualification did not amount to plain error, would be sufficient to meet the expert testimony requirement under ICWA.

The testimony of these three witnesses, aggregated with the other evidence and testimony of lay witnesses, was sufficient evidence to support the trial court's holding that returning the children to Lucy's care was likely to result in serious emotional or physical harm. Therefore, we do not need to address Lucy's challenge to Leah Ogoy's qualification as an expert.

### D. The Trial Court Did Not Err In Finding That Termination Of Lucy's Parental Rights Was In The Children's Best Interests.

■ Before parental rights are terminated, a court "shall consider the best interests of the child."[50] Termination is only possible when OCS proves "by a preponderance of the evidence that termination of parental rights is in the best interests of the child."[51] The trial court found that because of the struggles that the children had in Lucy's care and because the children are thriving in

**48.** *Marcia V.*, 201 P.3d at 504.

**49.** *Id.* at 505.

**50.** AS 47.10.088(c).

**51.** CINA Rule 18(c)(3).

their foster home, it was in Jack and Carmen's best interests for Lucy's parental rights to be terminated.

Lucy argues that because Jack and Carmen are Indian children, a more complex evaluation of their best interests is required that includes consideration of the importance of having the child raised within the Indian child's community. She contends that Bureau of Indian Affairs guidelines require that an Indian child should be outside of an Indian home only in extraordinary cases. OCS responds that ICWA itself does not require a determination that termination is in the child's best interests, and that this requirement instead arises only under State law.[52]

An argument similar to Lucy's was raised in *Jacob W. v. State, Department of Health & Social Services, Office of Children's Services*.[53] In an unpublished memorandum opinion, we held that while "ICWA requires that preference be given—in absence of good cause to the contrary—to members of the child's extended family or to someone otherwise affiliated with the child's Indian tribe.... [T]his specifically applies to placement of an Indian child; nothing in ICWA requires consideration of placement options in determining whether to terminate parental rights."[54] We have also previously indicated that we will consider separately a challenge to a termination order and a challenge to a placement decision.[55] Accordingly, we proceed with our review of the trial court's finding that termination of Lucy's parental rights was in Jack and Carmen's best interests.

Jack and Carmen have been out of the home since July 2006, when Carmen was eight months old and Jack was almost three years old. Both children have special needs and returning them to the home would place them at substantial risk of harm. Jack's behavior following recent visits, including waking in the night screaming and losing control of his bodily functions, suggests that he remains under stress when with Lucy for even short visits. Jack's therapist suggested that being in a situation where Andrew and Lucy fight would cause him increased emotional harm because of his hyperactive stress response.

In their current placement, both children are receiving services to assist with their special developmental and learning needs. Jack and Carmen's foster parents wish to adopt them, and there was testimony to support the trial court's conclusion that the children are bonded to their entire foster family. The foster mother has special skills and training as a therapist to provide the children with additional assistance. The testimony of Fleming and Kidd provided adequate evidence to support the trial court's finding that the children are thriving in their foster home and removing them would be contrary to their best interests. This is an appropriate consideration, as "the fact that a child has bonded with her foster parent can be a factor in considering whether it is in the child's best interests to terminate a parent's rights."[56]

Given the importance of consistency and stability in the lives of children with special needs and the combination of both historical harm and the likelihood of future harm to the children if they were returned to their mother's care, there is sufficient evidence to support the trial court's finding that terminating Lucy's parental rights was in the best interests of the children. The trial court's finding was not in error.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the trial court's decision to terminate Lucy's

---

**52.** AS 47.10.088(c); CINA Rule 18(c)(3).

**53.** Mem. Op. & J. No. 1319, 2008 WL 5101809 (Alaska, Dec. 3, 2008).

**54.** *Id.* at *9.

**55.** *Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 165 P.3d 605, 617 (Alaska 2007) (refusing to review a placement review decision as part of a termination proceeding because the placement decision was a final and appealable order).

**56.** *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 185 (Alaska 2008).

parental rights with respect to Jack and Carmen.