NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| SADIE D., | ) |
| | )     Supreme Court No. S-15404 |
| Appellant, | ) |
| | )     Superior Court No. 4FA-11-00085 CN |
| v. | ) |
| | )     MEMORANDUM OPINION |
| STATE OF ALASKA, | )        AND JUDGMENT[*] |
| DEPARTMENT OF HEALTH & | ) |
| SOCIAL SERVICES, OFFICE | )     No. 1516 - September 10, 2014 |
| OF CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

Appearances: Rachel Cella, Assistant Public Defender, Anchorage, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Joanne M. Grace, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

---

[*]     Entered under Appellate Rule 214.

# I. INTRODUCTION

Sadie D. appeals the termination of her parental rights to her son Jalen,[1] an Indian child as defined in the Indian Child Welfare Act (ICWA).[2] The superior court found that Sadie's mental health and substance abuse issues rendered her incapable of caring for her son. Sadie argues that the superior court erred in two of its findings: (1) that the Office of Children's Services (OCS) made active efforts to prevent the breakup of the Indian family, and (2) that Sadie's continued custody of Jalen was likely to cause the child emotional or physical harm. Sadie also argues that the superior court improperly considered facts not in evidence. We conclude that the superior court's factual findings have substantial support in the record and that its reliance on facts not in evidence was

---

[1]	We use pseudonyms for family members because of privacy considerations.

[2]	25 U.S.C. §§ 1901 – 1963 (2012). ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." *Id.* at § 1902.

Under Alaska Child in Need of Aid Rule 18(c), parental rights to an Indian child may be terminated at trial only if the court finds:

(1) by clear and convincing evidence that: (a) the child has been subjected to conduct or conditions described in AS 47.10.011; (b) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent; and (c) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family;

(2) beyond a reasonable doubt, including qualified expert testimony, that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child; and

(3) by a preponderance of the evidence that the child's best interests would be served by termination of parental rights.

harmless error.  We therefore affirm the superior court's termination of Sadie's parental rights.

## II.    FACTS AND PROCEEDINGS

As the superior court found, Sadie "suffers from a dual diagnosis of mental disease and substance abuse that impacts the fabric of her life at all levels."  Homeless, she entered a residential program for alcohol dependence when she was eight months pregnant.  But she behaved disruptively in groups and classes, refused counseling, violated house rules, and made inappropriate comments to staff and other residents.  She was discharged after just a few days because the program was unable to support her "advanced" mental health needs.

After Jalen was born in May 2011, Sadie moved into an apartment in Fairbanks.  She almost immediately felt unsafe there, however, and in September she moved with Jalen to the Fairbanks Rescue Mission.  A month later OCS received a report that Sadie was at a health center acting "acutely psychotic."  The health center referred her to the hospital for an evaluation, but she did not go.  The health center noted that Sadie was feeding Jalen "excessively" and "being really rough with him."

In late October the police were called to the Rescue Mission because Sadie was acting erratically and the director was concerned about her mental health.  When an officer arrived, Sadie appeared agitated and paranoid; she yelled at the cooks for slashing her car tires, accused them of being gang members, and made other unlikely accusations about the Rescue Mission.[3]  The staff was also concerned about Jalen, who had spent over three hours in a car seat, in the warm building, wearing a snowsuit with a blanket over his head; but no one took immediate action.

---

[3]    A police officer investigated Sadie's allegations and determined them to be false.

Three days later, on November 1, 2011, OCS took Jalen into emergency custody. The police had received a barely coherent 911 call from Sadie again accusing the staff of the Rescue Mission of various misdeeds, including trying to rape and murder her. When police and an OCS worker arrived, Sadie was agitated and panicky. When she could not be calmed, police officers took Jalen from her arms and escorted her to Fairbanks Memorial Hospital. OCS took temporary custody of Jalen and tried unsuccessfully to find immediate placement in an ICWA home (e.g., with a relative or a member of his tribe); he was eventually placed in foster care with a military family on a base in Fairbanks, then later moved to two other ICWA-preference homes.

After a hearing in December 2011, the superior court found probable cause to believe that Jalen was a child in need of aid under AS 47.10.011 subsections (6), (9), and (11) (physical harm, neglect, and parental mental illness). In May 2012, the parties stipulated that Jalen was a child in need of aid and agreed to a year of OCS custody. In September 2012, OCS filed a petition to terminate Sadie's parental rights, and a termination trial was held a year later. The superior court found by clear and convincing evidence that Jalen was a child in need of aid under AS 47.10.011, subsections (1), (6), (9), (10), and (11) (abandonment, physical harm, neglect, substance abuse, and parental mental illness). It found by clear and convincing evidence that Sadie had failed to remedy the conduct that placed Jalen at substantial risk of harm and that OCS had made active efforts to provide remedial services designed to prevent the breakup of the Indian family. It found beyond a reasonable doubt that Sadie's continued custody would result in physical or emotional damage to Jalen. And finally, it found by a preponderance of the evidence that termination of Sadie's parental rights was in Jalen's best interests. Finding all ICWA requirements met, the superior court terminated Sadie's parental rights.

Sadie appeals the superior court's findings on two of ICWA's statutory elements. She argues that the evidence did not support its findings that (1) OCS made

active efforts, and (2) Sadie's continued custody of Jalen was likely to cause him serious physical or emotional harm. She also argues that the superior court improperly considered facts not in evidence.

## III.  STANDARDS OF REVIEW

Whether OCS made active but unsuccessful efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family is a mixed question of fact and law.[4] "[W]hether substantial evidence supports the trial court's conclusion that a child is likely to be seriously harmed if returned to her parent is a mixed question of fact and law, while whether the expert testimony requirement of [ICWA] is satisfied is a pure question of law that we review de novo."[5] We will affirm factual findings that are not clearly erroneous.[6] We review legal questions de novo.[7]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Clearly Err When It Found That OCS Made Active Efforts To Prevent The Breakup Of The Indian Family.

"In a termination proceeding involving Indian children, the superior court must find, by clear and convincing evidence, that the State has made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of

---

[4]    *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011) (citing *Ben M. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)).

[5]    *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010) (alteration in original) (quoting *Ben M.*, 204 P.3d at 1018) (internal quotation marks omitted).

[6]    *Christina J.*, 254 P.3d at 1103 (citing *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[7]    *Id.* at 1104 (citing *Ben M.*, 204 P.3d at 1018).

the Indian family and that those efforts were unsuccessful."[8]   This is a case-by-case inquiry, and active efforts need not be perfect.[9]  "In general, active efforts will be found when OCS takes the client through the steps of the plan rather than requiring that the plan be performed on its own,"[10] but not if "the client must develop his or her own resources towards bringing [the plan] to fruition."[11]  "In assessing whether OCS met the active efforts requirement, a court may consider a parent's demonstrated lack of willingness to participate in treatment."[12]

Sadie contends that the superior court's findings on active efforts were "perfunctory" and, although listing OCS's efforts, failed to explain how they were appropriately tailored to Sadie's individual needs.  But the superior court detailed all the testimony about OCS's efforts on Sadie's behalf and concluded, on the basis of substantial evidence, that OCS "offered numerous assessments in order to help determine the scope, severity, and possible recommendations for treatment related to concerns about [Sadie's] mental health and substance abuse."  The court also found that OCS actively engaged in case planning and scheduled weekly meetings with Sadie in order to better

---

[8]     *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 527 (Alaska 2013); CINA Rule 18(c)(2)(B).

[9]     *Id.; Christopher C. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 303 P.3d 465, 478 (Alaska 2013) (citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011)).

[10]     *Philip J.*, 314 P.3d at 527 (quoting *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 602-03 (Alaska 2001)) (internal quotation marks omitted).

[11]     *Id.* (alteration in original) (quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010)) (internal quotation marks omitted).

[12]     *Id.* (quoting *Lucy J.*, 244 P.3d at 1114) (internal quotation marks omitted).

"understand [Sadie's] socio-economic and mental health concerns," meetings which were frequently unsuccessful because Sadie did not attend or suffered "destabilization through the meeting that required her to leave." The services OCS made available to Sadie, as identified by the superior court, included many that were specifically intended to assess and treat her substance abuse and mental health issues:

> referral for Women's and Children's Center for Inner Healing, referral and payment for mental health/substance abuse assessment with Hope Counseling Center, assistance in completing applications, following up with attorneys to assist [Sadie] in completing applications, attempts to help [Sadie] receive treatment out of state, intake at Turning Point Counseling for outpatient substance abuse treatment, referral to Fairbanks Community Behavioral Health for outpatient therapy, [and] urinalysis testing, . . .

among other things.

The evidence at trial supports the superior court's findings. By April 2012, several doctors and therapists had recommended a residential treatment facility that could handle Sadie's issues both with mental health and with substance abuse. But OCS was hampered by the severity of Sadie's needs and the limited number of facilities equipped to deal with them. The few options in Alaska had long wait lists, were unable to treat both mental health and substance abuse issues, or were too far from Fairbanks to accommodate visitation with Jalen, a prospect Sadie and OCS found unacceptable. And Sadie's issues were too severe for a lower level of care, such as outpatient therapy.

Still, OCS continued to explore the options. When Jalen's military foster family was restationed to Kansas and Sadie seemed open to treatment there, OCS investigated Kansas inpatient programs, though ultimately without success due to funding issues. Sadie calls OCS's exploration of a Kansas option "short-sighted and unrealistic," but it also shows the agency's willingness to explore any alternatives that appeared

plausible. In the fall of 2012 Jalen was moved to a new foster home in Anchorage in the hope that Sadie could find treatment in that area. OCS identified two suitable Anchorage-based treatment options, got application forms, and began working on them with Sadie. Sadie faults OCS for overlooking one possible option, but again, OCS's efforts need not be perfect in order to be legally sufficient.

Sadie argues that OCS failed to adjust its efforts to accommodate her limitations, but the record shows otherwise. OCS was persistent in its efforts to guide Sadie through the application process for the programs it identified as potentially able to help her. For example, knowing Sadie had difficulty keeping scheduled appointments, her case workers would drop their other work to meet with her whenever she appeared in the building unscheduled. Recognizing that just waiting at the OCS office sometimes made Sadie paranoid, staff members familiar with the case would try to have applications with them when they met her, so she wouldn't have to wait. And knowing that she could not last long in the office before she became impatient and agitated, her case worker encouraged her to fill in just one or two pages of an application at a time, making the task more achievable.

Sadie separately contends that OCS failed to encourage her therapeutic relationship with a mental health clinician at Tanana Chiefs Conference, whom Sadie had consulted on her own, instead insisting that she have another mental health assessment from a different psychologist. But OCS had a reasonable basis for its position: Sadie's clinician lacked collateral information that OCS considered vital for a reliable assessment. And there was evidence that OCS tried to make another assessment easy for Sadie — for example, by offering to hold it across the street from her house, or to pick her up and transport her to appointments — but Sadie refused to make herself available. Months were lost before she finally submitted to mental health assessment by a therapist she believed to be independent, Dr. Maile at the Alaska Psychiatric Institute.

OCS also made efforts to maintain Sadie's visitation with Jalen and preserve their mother-son bond. Supervised visits were held in the OCS office because Sadie's case workers recognized that busy places and outside stimuli often intensified her anxiety and paranoia. Even though Sadie often missed visits unexpectedly,[13] behaved inappropriately, or became agitated and left early, OCS continued to schedule visits designed to accommodate her needs. In the weeks before Jalen moved to a foster home in Anchorage, OCS increased Sadie's visitation time, and after the move OCS continued to fund monthly visits.

In sum, the record contains substantial evidence to support the superior court's finding that OCS actively engaged with Sadie in an effort to help her address her mental health and substance abuse issues, with the goal of allowing her to resume the care of her son. The superior court's finding of active efforts is not clearly erroneous.

**B.      The Superior Court Did Not Clearly Err In Finding That Sadie's Continued Custody Of Jalen Was Likely To Cause Him Serious Emotional Or Physical Damage.**

Sadie argues that OCS failed to satisfy ICWA's requirement that certain findings be supported by qualified expert testimony because neither of the State's two expert witnesses specifically testified that harm to Jalen was likely to occur if he was returned to her care. Under ICWA, the superior court could not terminate Sadie's parental rights without first finding that her continued custody of Jalen was likely to cause him serious emotional or physical harm.[14] Such a finding must be "supported by evidence

---

[13]      The reasons she gave for missing visits included sleeping in, depression, cocaine use, and hangovers.

[14]      25 U.S.C. § 1912(f) (2012); CINA Rule 18(c)(4).

beyond a reasonable doubt, including testimony of qualified expert witnesses."[15] Courts may aggregate expert and lay testimony in order to make this finding.[16]

Two of the State's witnesses at the termination trial — Lisa Farrell and Leif Vick — were qualified as experts. Farrell, a substance abuse counselor at Hope Counseling, was qualified as an expert in substance abuse and its treatment. She testified that Sadie lacked motivation to be sober, that Sadie's current living environment was not conducive to sobriety, and that Sadie suffered from high levels of anxiety but lacked the skills to manage it. Farrell testified that Sadie needed to be medicated in order to function in an environment with noise and children. Importantly, Farrell testified that if Sadie was going to have a child with her during treatment, she would need far more than a six-month substance abuse program before she would have the skills to parent. Farrell's "strong concerns regarding [Sadie's] multiple personality disorder or other dissociative disorders" persuaded Sadie's OCS case worker, who also testified, that Sadie's mental health issues were having "severe impacts on [her] ability to take care of [Jalen]."

The other expert witness, Vick, was a mental health clinician at Turning Point and was qualified as an expert in psychological assessments. Vick's testimony corroborated Farrell's. He recommended a long-term inpatient dual-diagnosis facility for

---

[15] 25 U.S.C. § 1912(f).

[16] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 964 (Alaska 2013); *Lucy J.*, 244 P.3d at 1117; *L.G. v. State, Dep't of Health & Soc. Servs, Office of Children's Servs.*, 14 P.3d 946, 950 (Alaska 2000).

On appeal, the State argues that the sufficiency of the expert testimony should be reviewed for plain error because Sadie did not raise it at trial, but Sadie had no obligation to object to the lack of expert support until the superior court entered its findings. *Vent v. State*, 288 P.3d 752, 753-55 (Alaska App. 2012) (holding that "an objection is not required to preserve an issue if the appealing party had no opportunity to make an objection"). Once the court issued its findings, Sadie had the right to appeal their factual basis, which she did.

Sadie because of the "level of severity [of] mental health needs that [she] exhibits." His intake assessment reported episodes of manic behavior and paranoid moods, and he testified that Sadie had attention deficits and "show[ed] difficulty in interactions with others [and] managing daily living."

From a number of lay witnesses, the court heard testimony about Sadie's problems with attention span, her antisocial behavior, and her ignorance of Jalen's needs, including reports of overfeeding him, overdressing him, and ignoring dangers.

Finally, the parties stipulated to the admission of the report of Sadie's expert, Dr. Maile. Dr. Maile's concerns included Sadie's deteriorating mental condition and her seeming inability to dress and feed Jalen appropriately. Dr. Maile believed that Sadie's behavior during visits with Jalen reflected a "lack of psychiatric stability." He noted that Sadie's problems with alcohol and other substances such as cocaine "impact[ed] her stability as well as her ability to be both responsive to a child and to maintain a stable lifestyle." He also pointed to the instability of Sadie's housing situation as presenting a risk to herself as well as to Jalen.

In the aggregate, including the testimony of qualified experts, the record supports the superior court's predictive finding that Jalen faced a likelihood of physical or emotional harm if he was returned to his mother's care. The superior court did not clearly err in making that finding.

### C. Any Reliance On Facts Not In Evidence Was Harmless Error.

Sadie argues that the superior court erred by considering facts not in the record, referring in its findings to information that must have been drawn from the State's petition for termination, which was not admitted as evidence at trial.[17] But because the

---

[17] Sadie argues that the superior court relied on the termination petition to find that Sadie attempted to feed Jalen unsanitary foods and that she had alcohol and cocaine (continued...)

evidence properly in the record was more than sufficient to support the superior court's findings, the claimed error did not affect Sadie's substantial rights.[18] The error was harmless and is not grounds for reversal.

## V.    CONCLUSION

We AFFIRM the superior court's order terminating Sadie's parental rights to her son Jalen.

---

[17](...continued)
in her system when taken to the hospital following an incident of assault and theft.

[18]    *See* Alaska R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.* 254 P.3d 1095, 1105 (Alaska 2011) (holding that trial court's consideration of documents filed after trial was harmless error because other evidence supported the trial court's findings of fact).