NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ARNOLD M., ) | |
| ) | Supreme Court Nos. S-16746/16747 |
| Appellant, ) | (Consolidated) |
| ) | |
| v. ) | Superior Court Nos. 3AN-15-00297/ |
| ) | 00300 CN (Consolidated) |
| STATE OF ALASKA, DEPARTMENT ) | |
| OF HEALTH & SOCIAL SERVICES, ) | MEMORANDUM OPINION |
| OFFICE OF CHILDREN'S SERVICES, ) | AND JUDGMENT* |
| ) | |
| Appellee. ) | No. 1687 – August 8, 2018 |
| ) | |
| ) | |
| HARRIET M., ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | |
| ) | |
| STATE OF ALASKA, DEPARTMENT ) | |
| OF HEALTH & SOCIAL SERVICES, ) | |
| OFFICE OF CHILDREN'S SERVICES, ) | |
| ) | |
| Appellee. ) | |
| ) | |

Appeals from the Superior Court of the State of Alaska, Third
Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: J. Adam Bartlett, Anchorage, for Appellant
Arnold M. Olena Kalytiak Davis, Anchorage, for Appellant

---

\* Entered under Alaska Appellate Rule 214.

Harriet M.   Anna R.  Jay, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before:  Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I.    INTRODUCTION

A mother appeals the termination of her parental rights to two Indian children; one child's father separately appeals the termination of his parental rights.  Both parents challenge the superior court's finding that the Office of Children's Services (OCS) made active efforts to reunify the family.  The mother also challenges several specific factual findings underlying the court's active efforts analysis.  Because the superior court's findings are not erroneous, we affirm the termination order.

## II.    FACTS AND PROCEEDINGS

Harriet[1] is the mother of Laurence, born in 2004, and Rio, born in 2011. Arnold is Rio's father.[2]  Laurence and Rio are Indian children under the Indian Child Welfare Act (ICWA).[3]

Harriet and Arnold both admit to struggling with substance abuse for many years, and they have a long history of domestic violence.  Harriet was incarcerated in April 2015, and OCS took emergency custody of Rio in May.  He was diagnosed with

---

[1]       We use pseudonyms for all family members to protect the family's privacy.

[2]       Laurence's father's parental rights were terminated in a separate proceeding; he is not a party to this appeal.

[3]       *See* 25 U.S.C. 1903(4) (2012) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

fetal alcohol spectrum disorder; one caseworker testified his physical neglect was "by far the worst [she had] ever seen" in 15 years working at OCS. OCS assumed custody of Laurence in June; he was diagnosed with post-traumatic stress and neurobehavioral disorders. In February 2016 both boys were adjudicated in need of aid under AS 47.10.011(1) (abandonment), (2) (incarcerated parent), (9) (neglect), and (10) (parent impaired by intoxicant), and OCS was granted temporary custody.[4] In April, following a disposition hearing, the court committed both boys to OCS custody for a period not to exceed two years.[5]

Prior to establishing a family case plan, OCS met separately with each parent, arranged with Department of Corrections (DOC) for regular visitation between Harriet and the children at the correctional facility, referred Arnold for a substance abuse assessment, and made referrals for substance abuse assessments for Harriet. While incarcerated Harriet participated in daily Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings, attended parenting classes, and obtained a job; following her release, she obtained and financed a substance abuse assessment through a non-OCS-recommended provider. Before and after Harriet's incarceration, OCS scheduled meetings with both parents, separately and together, with transportation provided, but neither parent attended or called to reschedule. One caseworker later testified that Arnold's consistent unavailability led her to conclude by the end of 2015 that he was intentionally avoiding her calls.

---

[4]    *See* AS 47.10.011 (enumerating instances where "court may find a child to be a child in need of aid"); CINA Rule 15(f)(1) (empowering court at adjudication to order child in need of aid placed in temporary OCS custody pending disposition).

[5]    *See* AS 47.10.080(c)(1) (authorizing court to commit child in need of aid to OCS custody "for placement in an appropriate setting for a period of time not to exceed two years").

OCS finalized a family case plan in January 2016. Both Harriet and Arnold were to: overcome their denial about substance abuse issues; submit to regular urinalysis (UAs); complete a substance abuse assessment; engage in psychotherapy, including signing releases for OCS to communicate with their providers; and obtain employment in Anchorage. Additionally, Arnold was to attend classes and complete education on the effects of domestic violence on children, maintain regular visitation with Rio and attend his appointments when Arnold was in Anchorage, obtain safe and sober housing, and remain clean and sober at all times. Harriet was to attend parenting classes and training about her children's diagnoses and be open and honest with OCS about her children's trauma history to assist properly diagnosing and treating the children.

The contact number Arnold provided OCS often did not work; caseworkers sent messages to Arnold through Harriet, but he did not return their calls. Arnold's failure to formally meet with OCS after the implementation of his case plan meant he did not provide a signed release of information, preventing OCS from providing him any referrals other than for UAs. Between March and June Arnold visited the hospital at least four times, reporting excessive drinking, alcohol withdrawal, and a suspected alcohol withdrawal seizure. He missed meetings with OCS, failed to appear for a UA in September, and tested positive for oxycodone in October.

Although Harriet met with OCS in April, attended AA meetings, and completed a substance abuse outpatient treatment program in October, she ceased responding to OCS's meeting requests after positive UAs for drugs in September and October (of which the treatment program was unaware). Harriet claimed she had provided her probation officer a prescription to account for the positive UAs, but she did not provide OCS the prescription. Harriet continued appearing for her UAs during October, even though OCS inadvertently had failed to renew the referral; she never informed OCS of the lapse. By the time of trial, Harriet had not completed the

recommended healthy relationship or parenting courses or overcome her denial of substance abuse.

OCS petitioned to terminate Harriet's and Arnold's parental rights in August 2016; the termination trial began in January 2017. The court found that OCS had made active efforts, including: attempts to contact both parents, although it had difficulty getting in touch with them on a consistent basis; making contact and setting up visitation with Harriet while she was incarcerated; communicating with Harriet's probation officer; scheduling meetings that both parents failed to attend; contacting Native Village of Point Hope's ICWA worker; establishing a case plan; referring both parents for substance abuse assessments and providing collateral information; and referring both parents for UAs to document their sobriety. The court found that Harriet had received active efforts while incarcerated and through assistance from her probation officer.

The court noted that "the parents were very resistant to [OCS]'s efforts"; Arnold in particular was "very evasive and failed to maintain contact with OCS," and he "did not even attend half of the termination trial." The court found the children were in need of aid under AS 47.10.011(8) (mental injury), (9) (neglect), and (10) (parent impaired by intoxicant), made all the other requisite findings, and ordered the termination of both parents' parental rights in March.

Harriet and Arnold separately appeal the orders terminating their parental rights. We consolidated the appeals for briefing and consideration.

## III.    STANDARD OF REVIEW

"A trial court's determination that OCS made active, but unsuccessful, efforts to provide remedial services and rehabilitative programs designed to prevent the

breakup of an Indian family presents a mixed question of fact and law."[6] Conclusions of law are reviewed de novo and factual findings are reviewed for clear error.[7]

"Findings are clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are left with 'a definite and firm conviction that a mistake has been made.' "[8] "When reviewing factual findings . . . we ordinarily will not overturn a trial court's finding based on conflicting evidence,"[9] and "[w]e will not reweigh the evidence when the record provides clear support for the superior court's decision."[10]

---

[6]    *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 961 (Alaska 2013) (citing *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010)).

[7]    *Id.* (citing *Lucy J.*, 244 P.3d at 1111).

[8]    *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[9]    *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003) (citing *In re Friedman*, 23 P.3d 620, 625 (Alaska 2001)).

[10]    *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 527 (Alaska 2013) (citing *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012)).

## IV.  DISCUSSION

### A.  The Underlying Findings Are Not Clearly Erroneous.

#### 1.  DOC's rehabilitative services

We have held as a matter of law that "efforts made by a parent's parole officer"[11] and "programs offered by [DOC] . . . [such as] classes in parenting, anger management, domestic violence, and therapeutic counseling" are "considered part of [OCS]'s efforts."[12]  The superior court found Harriet "received active efforts while incarcerated . . . [and] likewise received assistance, including drug testing, through her probation officer when in the community."  Harriet challenges this finding of fact.

Harriet "attended parenting classes, . . . went to numerous AA/NA classes, . . . [and] had a job" while incarcerated.  OCS arranged for Harriet's weekly visitation with Rio and Laurence and coordinated with a DOC social worker to inform Harriet of any visits the children were unable to attend.  Once Harriet was released, her probation officer arranged for UAs for several months.

Given this evidentiary record, and because we see no difference between the efforts of parole and probation officers, the superior court's finding that DOC provided Harriet rehabilitative services is not clearly erroneous.

#### 2.  Difficulties reaching Harriet

Harriet argues the superior court clearly erred in finding she was difficult to reach because several instances in the record either support or do not contradict that she was easily reachable for "approximately eighteen or nineteen of the twenty months

---

[11]  *Id.* (citing *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 765 (Alaska 2009)).

[12]  *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849-50 (Alaska 2009).

that this case was active." OCS disagrees, contending that Harriet provides conflicting evidence, at best, and that evidence in the record clearly supports the court's finding.

The court cited testimony from three OCS caseworkers that Harriet missed meetings and was difficult to reach on a consistent basis, particularly beginning in the summer of 2016. The family's first caseworker was able to meet with Harriet only once in September 2015, but Harriet missed or canceled meetings in July 2015 and January 2016. The second caseworker met with Harriet in April and June 2016, but Harriet failed to attend meetings or return her caseworker's calls in September through November. The final caseworker was able to track Harriet down to meet with her before two scheduled visitations in January 2017, but the caseworker testified that Harriet canceled meetings and that scheduling meetings with Harriet "was very difficult."

Harriet provides, at best, conflicting evidence of instances when OCS reached her; however, "we will ordinarily not overturn a superior court's findings based on conflicting evidence."[13] The superior court found that Harriet was difficult to reach on a consistent basis, particularly in the summer of 2016, and that she missed several meetings with each caseworker. This finding is supported by the record. Although Harriet points to instances when she communicated with OCS, the evidence she provides does not contradict the court's finding. Given the evidentiary support in the record, the superior court's finding is not clearly erroneous.

### 3. Harriet's resistance to OCS's efforts

We have held that it is not clearly erroneous for the superior court to find a parent uncooperative when there were "repeated instances" of the parent "declin[ing] to participate in [OCS] services" despite the parent "point[ing] to some evidence that [the

---

[13] *Brynna B.*, 88 P.3d at 529 (citing *Martin N.*, 79 P.3d at 53).

parent] was willing to participate."[14]  Here the superior court found "the parents were very resistant to [OCS]'s efforts."  Harriet disagrees, arguing that "the weight of the evidence shows . . . [she] stayed in contact with OCS throughout the case, and [she] was responsive and proactive regarding OCS's efforts and to treatment generally."  OCS contends that Harriet's resistance is "amply supported" by the record and that Harriet "points out at best only conflicting evidence about her level of cooperation."

Harriet claims she was "very engaged with her case plan and extremely consistent with visitation" because she completed a substance abuse program, participated in weekly UAs, attended parenting and healthy relationship classes, and engaged in weekly visitation with her children.

Three of Harriet's contentions about her active engagement are controverted by other facts in the record.  Harriet completed a substance abuse program, but she had positive UA test results during the same time period; she participated in weekly UAs, but she failed to stay in contact with OCS after tests came back positive. And, although Harriet attended parenting and relationship classes, she delayed attendance for nine months.

Finally, Harriet's participation in weekly visitation with her children — in and of itself — does not undermine the superior court's finding that "the parents were very resistant to [OCS]'s efforts."  The evidentiary record supports the finding that Harriet was "very resistant" to OCS's efforts to work with her to complete her case plan; the court's finding is not clearly erroneous.

---

[14]     *Philip J.*, 314 P.3d at 531-32 (comparing parent's failure to appear for scheduled counseling, last-minute cancellation of transportation- and lodging-provided visitation, disinterest in working case plan, refusal to undergo assessment, and failure to complete case plan, with parent's completion of classes while incarcerated and two meetings with behavioral aid following release, and concluding resistance finding was not clearly erroneous).

**B.      The Finding That OCS Made Active Efforts To Provide Rehabilitative Services And Reunify The Family Is Not Erroneous.**

The superior court found, by clear and convincing evidence, that active but unsuccessful efforts "ha[d] been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[15]  "The court conducts an active efforts inquiry on a case-by-case basis because 'no pat formula' exists for distinguishing between active and passive efforts."[16]  "As opposed to passive efforts such as simply developing a plan for the parent to follow, active efforts require that [OCS] actually help the parent develop the skills required to keep custody of the children."[17]  Active efforts are "required even if the parent is incarcerated, although '[t]he circumstances surrounding a parent's incarceration may have a direct bearing on what active remedial efforts are possible.' "[18]  OCS's efforts need not be perfect to meet the active efforts requirement, and we look to OCS's "involvement in its entirety."[19]

Harriet contends that OCS failed to make the required active efforts, characterizing many efforts as "passive" rather than "active," and that it failed to make referrals for programs identified in the case plan.  Arnold asserts that, although his "resistance to OCS efforts" may be a factor, ultimately the court erred in finding active

---

[15]      25 U.S.C. § 1912(d) (2012); CINA Rule 18(c)(2)(B).

[16]      *Philip J.*, 314 P.3d at 527 (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

[17]      *Dashiell R.*, 222 P.3d at 849 (citing *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995)).

[18]      *Id.* (alteration in original) (quoting *A.M.*, 891 P.2d at 827).

[19]      *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 271-72 (Alaska 2011) (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010)).

efforts because "OCS did not help [him] come to terms with either his resistance to OCS's efforts or his denial of his alcohol problem." OCS responds that it made active efforts over the 20 months it was involved with the family, "particularly in light of the parents' consistent refusal to acknowledge their substance abuse and domestic violence problems or accept treatment."

"Our concern is not with whether [OCS]'s efforts were ideal, but with whether they crossed the threshold between passive and active efforts."[20] The superior court properly considered the entirety of efforts from the time OCS became involved in May 2015 until trial in January 2017. In 2015 OCS worked with both parents to schedule meetings, discuss safety threats, and provide referrals for substance abuse assessments. OCS worked with DOC to provide Harriet regular visitation with the children at the correctional facility. While in DOC custody, Harriet attended AA and NA meetings, parenting classes, and was employed. After OCS established a case plan in January 2016, OCS and DOC continued facilitating Harriet's visitation with the children, and OCS provided Harriet and Arnold referrals and collateral information for substance abuse assessment, substance abuse programs, and UAs. OCS's eight-month delay in providing a case plan is not fatal because there was not a delay in active efforts, only a delay in creating a case plan.[21]

Harriet also argues referrals were not made to assist her in obtaining psychotherapy, education, or employment. But "OCS is not required to refer a parent

---

[20]    *Id.* at 272.

[21]    *Cf. E. A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002) (holding agency's failure to make active efforts in a particular seven-month period was "insignificant in light of the extensive remedial efforts [it] [had] provided throughout its involvement").

to specific support programs,"[22] and it "has discretion in determining what efforts to pursue based on the case plan and the parent's needs."[23] OCS contends it used its discretion in providing only certain referrals because the primary concerns were substance abuse and domestic violence. Given Harriet's difficulty maintaining sobriety and acknowledging her substance abuse, OCS's focus on assisting her with these issues prior to turning to therapy and employment is not fatal to the superior court's active efforts determination.

In conducting its inquiry, the court "may consider a parent's demonstrated unwillingness to participate in treatment as a factor."[24] The superior court found that Harriet and Arnold missed multiple scheduled meetings with OCS and that both were difficult to reach on a consistent basis. Caseworkers testified that both Harriet and Arnold avoided OCS's calls. Ultimately OCS tracked the parents down at scheduled visitations when they failed to attend meetings or return caseworkers' phone calls leading up to trial.

Harriet faults OCS for failing to renew her weekly UAs for the month of October; she attended, but was unable to complete, the testing. OCS concedes this missed action but notes testimony that it is the parents' responsibility to inform OCS of renewal lapses. Harriet never informed OCS of the lapsed request, despite OCS

---

**22** *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 529 (Alaska 2013) (citing *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1115 (Alaska 2010)).

**23** *Id.* at 534 (citing *Lucy J.*, 244 P.3d at 1115).

**24** *Pravat P.*, 249 P.3d at 271 (citing *Dale H.*, 235 P.3d at 213).

contacting her numerous times following her failure to attend a scheduled meeting in mid-October.[25]

Conceding "resistance to OCS efforts and the entirety of the efforts provided to the family are factors in this case," Arnold argues that "OCS did not help [him] come to terms with either his resistance to OCS's efforts or his denial of his alcohol problem." He faults OCS for failing to provide a psychotherapy referral, but he fails to acknowledge that OCS's incapability of providing referrals for services other than UAs resulted from his refusal to meet with his caseworker and sign a release of information form. We have previously noted that we have "never held that 'active efforts' requires OCS to track down parents who do not want to be engaged."[26] Arnold not only demonstrated a "lack of willingness to participate,"[27] he failed almost entirely to participate with OCS's efforts to address the issues that endangered his children. Arnold failed to provide OCS a working phone number to reach him, instead forcing caseworkers to contact him through Harriet; missed numerous meetings with caseworkers; had not completed his substance abuse program by the time the termination trial began; and did not even attend half of the trial. "We have repeatedly recognized that a child's need for permanence and stability should not be put on hold indefinitely while

---

[25] *See id.* at 272 (noting "a parent's lack of cooperation may excuse minor faults in OCS's efforts").

[26] *Cliff L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-16185, 2016 WL 4256874, at *4 (Alaska Aug. 10, 2016).

[27] *See Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008) (stating "a parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts" (quoting *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 603 (Alaska 2001))).

the child's parents seek to rectify the circumstances that cause their children to be in need of aid."[28]

The superior court did not err in determining OCS made active, but unsuccessful, efforts to reunify the family.

## V.    CONCLUSION

We AFFIRM the superior court's decision terminating Harriet's and Arnold's parental rights.

---

[28]    *Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 233 P.3d 597, 603 (Alaska 2010).